IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KURTIS NICKOLA, )
)
Plaintiff, )
)
v. ) No. 03 C 8559
)
) Judge Mark Filip
CNA GROUP LIFE ASSURANCE, CO., )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Kurtis Nickola ("Nickola" or "Plaintiff") brings this action against CNA Group Life

Assurance Company ("CNA" or "Defendant").[1] Plaintiff filed a complaint (D.E. 1)[2] that invokes

Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1132(a)(1)(B) ("Section 502"). Plaintiff alleges that he has been wrongfully denied

long-term disability ("LTD") benefits which he had been receiving for some three years prior to

Defendant's alleged wrongful and improperly justified termination of those benefits in 2003.

Plaintiff has moved for summary judgment (D.E. 12) and Defendant has filed a cross-motion for

summary judgment (D.E. 21). Defendant has also filed a motion to strike certain attachments to

Plaintiff's Response to Defendants' Statement of Facts (D.E. 29). As explained below,

Plaintiffs's motion (D.E. 12) is granted, Defendant's motion for summary judgment (D.E. 21) is

denied, and Defendant's motion to strike (D.E. 29) is denied—although in practical terms that

---

[1] For purposes of this opinion, the Court will treat all references to Continental Casualty as being references to CNA. These two formerly distinct organizations merged at some undisclosed time. In any event, the Court will follow the parties' lead and treat the titles as interchangeable with each other.

[2] The various docket entries in this case are cited as "D.E. __."

motion is of no consequence and is effectively moot.

I. **FACTS**[3]

From October 17, 1994, through November 6, 1999, Kurtis Nickola was employed by the

Ag States Agency, LLC, as a Department Manager for Consumers Coop Oil Company. (D.E. 12

¶ 7.) His background indicates that he has a high school diploma and his work experience

includes over seven years as an HVAC (heating, ventilation, and air conditioning) technician and

fifteen years as an automobile mechanic. (D.E. 22 ¶ 46.) His position required him to have

complete mobility, including the ability to climb stairs and ladders, carry heavy objects, squat,

and kneel. (*Id.* ¶ 13; D.E. 12 ¶ 7.) As part of his employment, Plaintiff was insured under, and

thus Plaintiff was a "participant" in, a long term disability plan ("LTD Plan" or "Plan")

underwritten by CNA. (D.E. 12 ¶ 8; D.E. 22 ¶¶ 5-6.)

The Plan provides for benefits after the passing of a 90-day elimination period. (D.E. 12

¶ 9.) Relevant to the present inquiry, the Plan defines "Disabled" as follows:

> *Disability* means that during the *Elimination Period* and the following 24 months, *Injury or Sickness* causes physical or mental impairment to such a degree of severity that You are:
>
>> 1. continuously unable to perform the Material and *Substantial Duties of Your Regular Occupation*; and
>>
>> 2. not working for wages in any occupation for which *You* are or become qualified by education, training, or experience.

---

[3] The relevant facts are taken from the Defendant's Local Rule 56.1 ("L.R. 56.1") statement of facts and exhibits, Plaintiff's response to Defendant's statement of facts, Plaintiff's LR 56.1 statement of facts, and Defendant's response to Plaintiff's statement of facts. As cited, the facts are also taken from the Administrative Record ("A.R. ___"). Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court, as it must, resolves genuine factual ambiguities in the respective non-movant's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

After the LTD *Monthly Benefit* has been payable for 24 months, *Disability* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

> 1. continuously unable to engage in any occupation for which You are or become qualified by education, training, or experience; and
>
> 2. not working for wages in any occupation for which *You* are or become qualified by education, training, or experience.

(D.E. 22 ¶ 8 (emphasis in original).) There were also some specific limitations on the amount of earnings one could acquire and still qualify under the LTD Plan. (D.E. 22 ¶ 10.) The Plan further states other requirements to filing a claim. In relevant part,

> The following items, supplied at *Your* expense, must be a part of *Your* proof of loss. Failure to do so may delay, suspend, or terminate *Your* benefits:
>
> 5. Objective medical findings which support Your Disability. Objective medical findings include but are not limited to tests, procedures, or clinical examinations accepted in the practice of medicine, for *Your* disabling condition(s).
>
> 6. The extent of Your Disability, including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation*.

(*Id.* ¶ 9.)

Amendment Number 4 to the policy, which potentially took effect on January 1, 2002 (this is a matter of dispute between the parties, as referenced below), states that

> [t]he Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine Your eligibility for and entitlement to benefits under the Plan and to interpret the terms and provisions of any insurance policy issued in connection with the Plan. With respect to making benefit decisions, the Plan Administrator has delegated sole discretionary authority to Continental Casualty Company to determine Your eligibility for and entitlement to benefits under the Plan and to interpret the terms and provisions of any insurance policy issued in connection with the Plan.

(*Id.* ¶ 10.) The Amendment was signed by the Chairman of the Board of Continental Casualty

3

Company, and the Plan was maintained by Ag States Agency, LLC. (D.E. 13 at 004, 008.) In addition, the Plan contained a Certificate of Insurance, which stated that "[w]hen making a benefit determination under the policy, [Continental Casualty Company has] discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy." (D.E. 22 ¶ 11.)

Nickola signed his "LTD Employee's Statement" on November 12, 1999. (D.E. 12 ¶ 12.) This statement indicated that his last day of work was November 5, 1999. (*Id.*) About this time he requested LTD benefits. Over the next month, Dr. James Slattery ("Dr. Slattery"), Dr. James Sehloff ("Dr. Sehloff"), and Dr. Steven Johnson ("Dr. Johnson") submitted documents to CNA indicating, respectively, that Plaintiff's cervical spine degeneration limited him to sedentary exertion, that his asbestosis and pulmonary disease also limited his work ability, and that Nickola also suffered from spasmodic, frenzied diarrhea. (*Id.* ¶¶ 13-15; D.E. 22 ¶¶ 14-16.) On or about December 23, 1999, Plaintiff filed his claim for benefits under the Plan. (D.E. 22 ¶ 12.)

Dr. Slattery, in particular, had treated Nickola for some time prior to the November filing; in addition to assessing back pain since June 1998 (he was treating Nickola for degenerative changes of the cervical spine (D.E. 12 ¶ 17)), in August 1998 Dr. Slattery noted that Plaintiff was "using Vicodin four to five tables daily," and this Vicodin use was not impeding Plaintiff's ability to work. (D.E. 22 ¶ 22.) Apparently, however, by November 1999, Plaintiff's chronic pain from his back was sufficiently intense that Dr. Slattery increased Plaintiff's OxyContin[4] dose (seemingly from 80 mg/day to 120 mg/day), and continued the Vicodin for "breakthrough

---

[4] OxyContin is a narcotic pain reliever similar to morphine. It is intended to relieve pain which is moderate to severe in intensity. See www.fda.gov/cder/drug/infopage/oxycontin.

pain." (D.E. 12 ¶ 17; A.R. 247.) During this time period, it appears that Plaintiff's pulmonary problems (stemming largely, if not entirely, from his asbestosis) remained status quo and neither improved nor worsened.[5] (D.E. 22 ¶ 25.) At around the same time, Dr. Johnson noted that Nickola had been vomiting in the mornings and having intermittent diarrhea and constipation. (D.E. 12 ¶ 18.) As a consequence, he concluded that disability was appropriate, and that Nickola could work a sedentary job, although he would have to miss numerous days due to his various maladies. (*Id.*; D.E. 22 ¶ 35.)

On February 22, 2000, CNA approved Nickola's application for LTD benefits, with a recognized disability date of November 6, 1999. (D.E. 12 ¶ 28; D.E. 22 ¶ 36.) Benefits became payable on February 4, 2000, after the expiration of a ninety-day elimination period. (D.E. 12 ¶ 28.)

By late 2001, Dr. Johnson's treatment notes indicate Nickola was taking a wide variety of medicines to treat, among other things, pain, insomnia, and GI symptoms. (D.E. 12 ¶ 19.) Dr. Johnson also signed an Attending Physician's Statement showing that Dr. Johnson diagnosed Plaintiff with "(1) Chronic Diarrhea, (2) Cervical Radiculitis - Chronic; neck pain, (3) COPD [chronic obstructive pulmonary disease] - Pulmonary Fibrosis & asbestosis," and Dr. Johnson stated that Plaintiff's symptoms had not changed in the past three years. (D.E. 22 ¶ 38.) Dr. Johnson further noted that he "expect[ed] no improvement. No treatments (different from already tried) available." (*Id.*)

On February 7, 2003, in response to an inquiry from CNA, Dr. Johnson completed a

---

[5] It appears that Plaintiff was first diagnosed with asbestosis in either 1994 or 1995. (D.E. 13 at 275.) The extent to which the affliction worsened between 1995 and approximately late 1999 is unclear.

Functional Assessment Tool which indicated he did not believe Nickola would be capable of performing full-time work that was primarily seated in nature, but allowed the flexibility to stand when needed and required lifting less than ten pounds. (D.E. 22 ¶ 44; D.E. 12 ¶ 24.) On February 7, 2003, Dr. Johnson again examined Nickola and concluded that he continued to have severe abdominal and bowel issues, for which there had been no effective treatment. (D.E. 22 ¶ 45; D.E. 12 ¶ 25.) On May 9, 2003, Dr. Johnson again concluded that he believed Nickola was "permanently disabled" by his problems. (D.E. 22 ¶ 48.)

In a May 16, 2003, letter to CNA's Rebecca Katz ("Katz"), Dr. Johnson again stated he did not think Nickola had improved and concluded that Nickola's "gastrointestinal problems cause unpredictable and intermittent diarrhea and vomiting. If he was to hold a job, I would expect he would miss probably every other day . . . . In addition, [Nickola] is on chronic narcotics on a daily basis . . . ." (D.E. 12 ¶ 27.) Furthermore, by 2003, Plaintiff's prescribed narcotics treatment had doubled from the level in 1999, in that he was taking 240 mg/day of OxyContin. (*Id.*) Dr. Johnson stated he would "not expect somebody that is taking 240 mg of OxyContin a day to be able to able to function normally or appropriately in any sort of job situation." (*Id.*) In sum, Dr. Johnson concluded that Nickola's medical and severe diarrhea problems would interfere "with virtually any job he might hold," such as security guard or customer support representative. (*Id.*) While the demands of the job (*e.g.*, walking, not sitting) would preclude the former, the apparent justification for the latter stems from the likelihood that Nickola would, in Dr. Johnson's view at least, regularly miss substantial amounts of time on an unpredictable but recurrent basis.

There is no evidence in the record that Dr. Johnson witnessed the sudden intestinal

6

attacks; Defendant claims (and this is not substantially challenged by Plaintiff) that most of Dr. Johnson's statements in this regard were based on Nickola's reporting of his symptoms to Dr. Johnson. (D.E. 22 ¶ 54.) Nonetheless, as Plaintiff highlights, there is material third-party corroboration for Plaintiff's claims about his vomiting and spasmodic diarrhea. Specifically, his former boss, Daniel Baun, wrote Defendant to attest to Nickola's health problems, including having seen the regular, emergency, spasmodic diarrhea episodes. *See* A.R. 105 (Baun letter to CNA in conjunction with benefits appeals review process, in which Baun attests to having seen Nickola's "sudden and unpredictable needs of bathroom facilities, often interrupting in the middle of a sentence or discussions. These interruptions can last for five, ten or several minutes longer. And these are on good days. There are many times when he is virtually bed ridden or confined to a chair or even the bathroom for hours at a time. How is it possible for any employer to even consider hiring a person in this condition?"); *see also* A.R. 102-03 (Baun letter protesting Defendant's final denial of LTD benefits for Plaintiff and discussing various issues, including regular emergency diarrhea episodes).

On April 30, 2003, CNA issued a determination that Nickola was no longer disabled and thus would be discontinuing his LTD benefits. (D.E. 12 ¶ 30.) The finding indicated that Nickola was able to fill other appropriate jobs, such as "Automotive Materials Dock Supervisor," "Customer Support Representative," and "Stationary Security Guard," and it included vocational assessment assertions offered by its claim representative, Ms. Rebecca Katz. (*Id.*) Nickola requested an appeal on May 21, 2003. (*Id.* ¶ 31.) On June 13, 2003, CNA advised Plaintiff that his file was being referred to a medical consultant for assessment and CNA further indicated that it would reinstate Plaintiff's benefits pending that review. (D.E. 22 ¶ 51.)

On July 21, 2003, Dr. Eugene Truchelut ("Dr. Truchelut"), serving as a medical consultant to CNA, provided an initial report to Rebecca Katz. (D.E. 12 ¶ 38.) (Defendant apparently had not had a medical consultant review the file before it decided to reverse its prior disability determination and to conclude that continued LTD payments for Plaintiff were inappropriate.) Dr. Truchelut concluded that Nickola's pulmonary difficulties mandated that he not go above a sedentary exertional level and that his gastrointestinal symptoms would "not preclude each and every occupation" if a restroom "was close at hand." (*Id.*; D.E. 22 ¶ 52.) He found that "the information provided in the medical records supplied and reviewed above does not currently support the claimant's inability to perform full-time work if this was primarily seated with the flexibility to stand when needed, use a keyboard and mouse and required no lifting more than ten pounds." (D.E. 22 ¶ 52.) Two days later, after speaking with Dr. Johnson, Dr. Truchelut supplemented his report with more notes, but his ultimate conclusion (that Nickola was not entirely disabled) remained the same. (*Id.* ¶ 56.) After the supplement was filed, the Appeals Committee informed Plaintiff that CNA decided not to change its April 30 decision terminating payment of Nickola's LTD benefits. (D.E. 12 ¶ 34; D.E. 22 ¶ 58.) In late November 2003, Plaintiff filed this action claiming wrongful denial/termination of benefits under ERISA. (D.E. 22 ¶ 59.)

## II.   **STANDARDS OF REVIEW**

### A.   ERISA

Under ERISA, the judicial standard of review for benefit determinations hinges on whether the plan administrator or fiduciary has been granted discretion in making the benefit determination. *See, e.g.*, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). As a

8

default, courts review benefit determinations under ERISA through a *de novo* standard. *Id.* However, if the administrator or fiduciary is given discretionary authority to determine eligibility for benefits, the decision will be reviewed under the deferential arbitrary and capricious standard. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 773 (7th Cir. 2003). For a plan to convey enough discretion to a plan administrator to trigger the more administrator-friendly review, the plan "'must contain language that . . . indicates with the requisite if minimum clarity that a discretionary determination is envisaged.'" *Coles v. LaSalle Partners Inc. Disability Plan*, 287 F. Supp. 2d 896, 900 (N.D. Ill. 2003) (quoting *Herzberger v. Standard Ins. Co.*, 205 F.3d 315, 331 (7th Cir. 2000)).

Under the arbitrary and capricious standard, determinations will be overturned by the court if they are "unreasonable, and not merely incorrect." *Herzberger*, 205 F.3d at 329; *accord, e.g., James v. Gen. Motors Corp.*, 230 F.3d 315, 317 (7th Cir. 2000) (stating that a benefit determination will only be found arbitrary and capricious when "downright unreasonable"). Nonetheless, while arbitrary-and-capricious review is quite deferential, it does not involve the court being a "'rubber stamp.'" *Hupp v. Metromail Corp. Special Severance Plan*, 133 F. Supp. 2d 681, 688 (N.D. Ill. 2001) (quoting *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994)). Reversal is warranted, for example, when the court is "very confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of the evidence." *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985). In other words, when the arbitrary and capricious standard is applied, the decision of the administrator will be left undisturbed if (and only if) the administrator "'makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts. . .

.'" *Wolff v. Continental Cas. Co., a CNA Co.*, No. 03 C 4667, 2004 WL 2191579, at *9 (N.D. Ill.

Sept. 28, 2004) (quoting *Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 898 (7th

Cir. 1993)); *accord, e.g., Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir.

2001) (teaching that decision is arbitrary and capricious where it fails to consider and analyze an

important factor that bears on the assessment) (citing *Exbom v. Central States, Southeast and

Southwest Areas Health and Welfare Fund*, 900 F.2d 1138, 1142-43 (7th Cir.1990)).

      B.    Summary Judgment

      Summary judgment is proper where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but

must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316,

1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue

of material fact, *see Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation

omitted). Mere "metaphysical doubt as to the material facts" does not amount to a genuine issue

for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court views the record and all reasonable inferences drawn therefrom in the light most

favorable to the nonmovant. *See Fed R. Civ. P. 56(c); see also Foley v. City of Lafayette*, 359

F.3d 925, 928 (7th Cir. 2004). The party opposing summary judgment may not rest upon the

pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See

Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue for trial

unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict

for that party." *Id.*

As courts in this district have repeatedly noted, when, as here, parties have filed cross-motions for summary judgment, the analytical endeavor can be a Janus-like one that can require consideration of any legitimate factual disputes in the record as they bear on each movant's respective summary judgment claims. *See, e.g., Northern Contracting Inc. v. State of Illinois*, No. 00 C 4515, 2004 WL 422704, *46 (N.D. Ill. March 3, 2004) (Pallmeyer, J.) (quoting *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill. 1992)). The Court proceeds accordingly.

## III.    DISCUSSION

### A.    The Court Will Assume That The Appropriate Standard of Review is The Arbitrary and Capricious Standard

In this case, the parties engage in lengthy and contentious disputes about the applicable standard of review. These disputes relate to subjects such as: whether the record establishes that the Amendment Number 4 referenced above actually was properly accepted by Defendant; whether Defendant effected a valid reservation of discretion and delegation of discretion that comports with the specific requirements of the ERISA statute and regulations; whether a particular Seventh Circuit decision (*Ruiz v. Continental Cas. Co.*, 400 F.3d 986 (7th Cir. 2005)) was correctly decided or is in implicit conflict with other Seventh Circuit caselaw such that its apparent holding must be disregarded, even by this District Court; and whether a proposed rule of the Illinois Department of Financial and Professional Regulation, Division of Insurance, that would purport to prohibit discretionary clauses in accident and health insurance policies, mandates a *de novo* standard of review in this case. The parties also reference the possibility that the state regulation (or, to be more specific, the proposed regulation) is preempted by the federal

11

ERISA regime, and the related possibility that the regulation cannot be preempted because it falls with ERISA's savings clause, 29 U.S.C. § 1144(b)(2)(A).

The Court declines to entertain these debates, because even if Defendant is correct that the arbitrary and capricious standard of review applies, Defendant's decision to terminate payment of Plaintiff's LTD benefits still must be reversed, as explained below. There is no need to attempt to resolve all of these issues and sub-issues (for some of which there seems to be little relevant precedent to guide the analysis) because Defendant's process and analysis in terminating Plaintiff's long-term disability benefits is so defective that it fails arbitrary and capricious review. Accordingly, the Court will assume without deciding that the arbitrary and capricious standard applies.

B.      Defendant's Decision to Terminate Nickola's Long-Term Disability Benefits Fails the Arbitrary and Capricious Standard of Review

As explained below, the Court concludes that Defendant's decision to terminate payment of the long-term disability benefits it had previously awarded to Plaintiff was downright unreasonable for a number of reasons. Some of those reasons are interrelated, but there are at least three independent bases for reversal (*see* III B.1, III B.3, and III B.4, *infra*), as explained further below.

1.      Defendant Failed to Adequately Consider and Explain The Impact of Plaintiff's Prescribed Narcotics Use

Defendant's decision to cease paying Plaintiff's LTD benefits is subject to reversal because of Defendant's lack of meaningful analysis of whether Plaintiff's daily use of substantial amounts of prescription narcotic pain medication rendered him incapable of obtaining and keeping gainful employment. In this regard, Plaintiff's physician in May 2003 noted, in

12

discussing various medical problems of Plaintiff, that Plaintiff was "on chronic narcotics on a daily basis, and I certainly would not expect somebody that is taking 240 mg of OxyContin per day to be able to function normally or appropriately in any sort of job situation." (A.R. 152); *see also* A.R. 105 (letter from Plaintiff's former employer, expressing extreme displeasure with Defendant's decision to terminate Plaintiff's LTD benefits, and asserting that Plaintiff is effectively unemployable given the "massive amount of prescribed narcotics [he takes] on a daily basis").

In its review of Plaintiff's LTD benefits status on appeal, Defendant's medical reviewer stated that Plaintiff's

> cervical pain has reportedly been treated successfully with narcotic analgesics, which the claimant has been taking for some time and with habituation to these, should not necessarily be an occupational problem. In fact in the older records, it was noted that the claimant actually missed less work because of the use of these drugs.

(A.R. 124.) The reference in the last sentence is an apparent reference to a 1998 report of Dr. Slattery, of which Dr. Johnson was sent a copy, where it noted that Plaintiff was taking four to five Vicodin tablets daily, and further noted that the use of such pain killers was allowing Plaintiff to miss work less frequently and to participate better in family activities. (A.R. 251.) In addition, although it does not appear to be specifically referenced in the medical reviewer's notes, there also is a 1999 record of Dr. Slattery, in which he noted that Plaintiff had been using 80 mg of OxyContin per day, along with four Vicodin tablets for breakthrough pain. (A.R. 247.) At that time (*i.e.*, prior to Defendant having awarded Plaintiff LTD benefits), Dr. Slattery suggested that Plaintiff would be capable of sedentary work. (A.R. 246.)

Irrespective of what records suggested was the situation in 1998 or 1999, by 2003, it is

clear that there was meaningful medical evidence taking the position that Plaintiff's increased

doses of narcotic medication had reached the point where they were disabling and precluded him

from gainful employment. (A.R. 152.) Furthermore, there was at least some third-party

corroboration from Plaintiff's former supervisor that Plaintiff's narcotics usage rendered him

unemployable. (A.R. 105.) Precedent teaches that an administrator cannot fail to adequately

address the potential impact of narcotic pain medication on a claimant's ability to hold a job. *See*

*Adams v. Prudential Ins. Co. of America*, 280 F. Supp. 2d 731, 740-41 (N.D. Ohio 2003)

(collecting numerous cases, and finding administrator's decision to terminate LTD benefits was

arbitrary and capricious where administrator failed to consider the impact of, *inter alia*,

OxyContin); *accord, e.g.*, *Conrad v. Reliance Std. Life Ins. Co.*, 292 F. Supp. 2d 233, 241-42 (D.

Mass. 2003) (similar).

Although Defendant was not required to agree with the evidence in the record

maintaining that Plaintiff was disabled because of his prescription narcotic use as of 2003,

Defendant was required to make a meaningful and reasoned assessment of what impact that drug

use would have on Plaintiff's ability to obtain and hold a job. Reliance on the fact that, years

earlier, Plaintiff had tolerated and been helped by what the parties appear to agree were

significantly lower doses of prescription narcotics does not answer the question of whether

Plaintiff's use of substantially greater amounts of pain-killers was disabling as of 2003. Given

Defendant's failure to address this significant issue—which at least one physician thought alone

impeded Plaintiff from keeping a gainful job—Defendant's decision to terminate Plaintiff's LTD

benefits was arbitrary and capricious. *See, e.g.*, *Hess*, 274 F.3d at 461 (teaching that plan

administrator's decision is arbitrary and capricious where decision failed to consider important

14

factor that bears on the analysis) (citing *Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund*, 900 F.2d 1138, 1142-43 (7th Cir. 1990)).

> 2. Defendant Failed To Justify Its Decision to Depart from Its Prior Conclusion That Plaintiff Was Entitled to Long-Term Disability Payments

Defendant expressly acknowledges that where, as here, the insurer had determined that the Plaintiff was entitled to LTD benefits, "'the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to terminate those payments.'" (D.E. 21 at 19 (acknowledging and quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)). To be sure, and as commonsense would suggest, a decision that someone is entitled to long-term disability payments at one point in time does not forever estop the insurer from changing its mind. *Accord McOsker*, 279 F.3d at 589. Fortunately, sick and disabled people often get better, and their ability to return to work is only one positive consequence of such a development. Nonetheless, as common sense also would suggest, if an insurer has already admitted that someone is so incapacitated that they are entitled to long-term disability payments, one can reasonably view the failure to produce evidence of improvement as a suspicious failing if the insurer decides that LTD benefits are no longer warranted. *See id.*; *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1331 (11th Cir. 2001).[6]

In this case, Defendant had decided that Plaintiff qualified for long-term disability

---

[6] The Court is not implying that Nickola's LTD benefits had vested perpetually in 2000, or that Defendant was precluded from determining that circumstances had changed such that LTD benefits were not longer appropriate (or even, one can assume, that Defendant had erred the first time and now analyzed things correctly). Instead, the Court is saying, as caselaw teaches and Defendant even concedes, that if an insurer already has acknowledged that someone is suffering from a long-term disability, one can reasonably expect a reasoned explanation if the insurer changes position, and that failure to show evidence of improvement is not an immaterial consideration in assessing whether a change of course is defensible.

benefits under the Plan and was providing him with a monthly benefit in the amount of approximately $2,285. (A.R. 190.) Defendant further stated that "[t]his benefit is payable thru 12/26/2018 providing you continue(s) to meet the terms of the Long Term Disability policy." (*Id.*)

Notwithstanding this prior statement, Defendant can point to no serious evidence in the record that Plaintiff had improved from his total disability status at the time that Defendant decided to terminate the LTD benefits. In its briefing, Defendant states that "in this case, there was evidence that Plaintiff's condition had improved. The Social Security Administration decision revealed that when Dr. Singaram examined Plaintiff for his abdominal problems, he 'noted that claimant's constipation had greatly improved.'" (D.E. 21 at 19 (quoting A.R. 202).) Defendant's position, however, with all respect, is misplaced. The ALJ's decision—which denied Social Security benefits, and which incidentally was subsequently overturned and remanded by Judge Crabb of the United States District Court for the Western District of Wisconsin—did note that Dr. Singaram in the Summer of 2000 had indicated that Plaintiff had substantially less trouble with constipation. However, constipation problems are not even close to the center of the medical conditions that Plaintiff and his physicians have identified as justifying his disability status. Simply put, the passing reference to long-past improvement in the area of constipation (Defendant terminated Plaintiff's LTD in 2003) is a make-weight attempt to find some evidence of improvement during the time that Plaintiff was awarded LTD benefits.

In conjunction with Defendant's failure to identify evidence of material improvement from the time that Plaintiff was previously awarded LTD benefits, the Court also notes that Defendant initially decided to terminate Plaintiff's LTD benefits without even having a physician

16

look at whether termination was appropriate. Put differently, Defendant did not have an MD look at whether termination was appropriate until after Plaintiff had appealed the termination of his prior LTD benefits. (*See, e.g.*, A.R. 155 (initial termination of LTD benefits determination from April 30, 2003); A.R. 128 (June 13, 2003 letter from Defendant to Plaintiff acknowledging request for appeal of benefits termination decision and indicating that Plaintiff's "file will also be referred to a Medical Consultant for an assessment"). Given that Plaintiff had submitted a substantial amount of medical opinion that he was disabled,[7] and Defendant had identified no meaningful evidence to indicate that Plaintiff's situation had materially improved since the time that Defendant found that Plaintiff was entitled to LTD benefits, Defendant's decision to terminate Plaintiff's benefits without even initiating an MD review raises questions about the sincerity of Defendant's benefits review. The Court is not stating that a medical review is *always* necessary, of course, but when an insurer has already determined that LTD benefits are appropriate, and there is no concrete evidence of improvement, an insurer's decision to reverse its prior decision without even having a medical review of the file raises commonsense doubts about the *bona fides* of the review process and decision to terminate LTD benefits. *Accord Hess*, 274 F.3d at 461 (teaching that one can employ common sense in assessing whether an insurer's decision is arbitrary and capricious) (citing *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th

---

[7] *See, e.g.*, A.R. 160 (February 2003 report of Dr. Johnson stating that [r]eally no Tx has been effective for his bowel Sx . . . . I think he is still disabled and unable to work as a result of his multiple problems"); A.R. 259 (November 1999 report of Dr. Johnson stating, *inter alia*, that "I think disability is appropriate" and that "[i]t is possible symptoms may improve over the next few months but I doubt that given his longstanding history") *see also* A.R. 244 (December 1999 record of Dr. Johnson noting that if Plaintiff were to hold a job, he "will frequently miss days due to diarrhea, pain"); A.R. 195 (January 2002 letter from Dr. Johnson to Defendant stating that Plaintiff "has multiple chronic problems which include chronic gastrointestinal difficulties, chronic cervical radiculitis and pulmonary fibrosis and asbestosis").

Cir.1996)).

### 3. Defendant Failed to Consider the Total Impact of Plaintiff's Conditions On His Ability to Obtain and Maintain Employment

Precedent teaches that an administrator making a disability determination must make a reasoned assessment of whether the total combination of a claimant's impairments justify a disability finding, even if no single impairment standing alone would warrant the conclusion. *See, e.g., Austin v. Continental Cas. Co.*, 216 F. Supp. 2d 550, 558 (W.D.N.C. 2002) ("It is consideration of the full panoply of ailments and their combined impact on capacity for work that is important, as appellate courts consistently have found . . . .") (citing *Layton v. Heckler*, 726 F.2d 440, 442 (8th Cir. 1984)).[8] Defendant failed to engage in reasoned decisionmaking by considering this possibility, and that deficiency alone would justify reversal of Defendant's termination of Plaintiff's LTD benefits.

In this regard, the Court notes (although it is certainly not essential to the Court's analysis) that the Defendant's own papers suggest that it previously thought that the combined impact of Plaintiff's health impairments were material to its determination of LTD status. *See* A.R. 301 (Defendant's internal screening sheet concerning LTD benefits application, in which Defendant accepted liability on Plaintiff's claim "[d]ue to multiple chronic deteriorating

---

[8] Defendants correctly note that *Austin* appears to have applied a presumption in favor of crediting the views of a claimant's physician that is inconsistent with the Supreme Court's subsequent teaching in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Nonetheless, this Court is not citing *Austin* for any proposition that the views of a claimant's physician are entitled to a privileged status. Instead, the Court cites *Austin* for the well-established and commonsense proposition that the combined impact of a number of negative health conditions can be greater than the impact of any one of them. Accordingly, even if one single impairment might not be debilitating, the combined force of multiple impairments might be, and that subject merits a reasoned assessment.

conditions including asbestosis, cervical radiculopathy, diarrhea, peptic ulcer disease +

diverticulitis — will not improve, deteriorate . . . [over] time"). In any event, Defendant did not

adequately consider the combined impact of Plaintiff's various maladies on his ability to obtain

and hold a job. Plaintiff has a variety of documented ailments, including asbestosis, COPD, and

neck and scapular pain related to degeneration in his spine that has limited his range of motion

and has prompted substantial usage of prescription narcotics for pain treatment. *See, e.g.*, A.R.

152 (letter from Dr. Johnson in 2003 stating that Plaintiff's "gastrointestinal problems cause

unpredictable and intermittent diarrhea and vomiting. If he was to hold a job, I would expect he

would miss probably every other day as a result of this difficulty. He, in addition, is on chronic

narcotics on a daily basis, and I certainly would not expect somebody that is taking 240 mg of

OxyContin per day to be able to function normally or appropriately in any sort of job situation");

A.R. 170 (Dr. Johnson detailing various impairments); A.R. 195 (same); A.R. 208 (same). As

discussed elsewhere, Plaintiff also has, or at least is reported to have violent, recurrent,

spasmodic diarrhea episodes that would necessitate his being absent from the work place on an

unpredictable, yet recurrent and regular basis. Defendant must make a reasoned assessment,

which it did not do, of whether the total impact of these problems would justify maintaining his

prior award of LTD benefits. Furthermore, precedent teaches that Defendant must make a

reasoned assessment of how these impairments in the aggregate would impact Plaintiff's ability

to maintain a job, assuming he could be hired at one. *See, e.g.*, *Ruggerio v. Fedex*, No. Civ. A.

01-11809-RWZ, 2003 WL 21955024, at *3 (D. Mass. Aug. 14, 2003) (overturning benefits

denial because of lack of consideration of the combined effect of plaintiff's problems, "which at

best, make her an unreliable worker as they do not manifest in a linear fashion and, at worse,

19

totally disable her for unspecified and unpredictable periods of time"); *see also Dix v. Sullivan*, 900 F.2d 135, 138 (8th Cir. 1990) (overturning denial of SSA benefits because "'[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time'") (quoting *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)) (emphasis in original). Defendant did not make that assessment, and as such, its decision to terminate Plaintiff's LTD benefits is not sufficiently reasoned even to pass arbitrary and capricious review. *See also* A.R. 105-06 (letter from Plaintiff's former employer stating that it is "appalled" that Plaintiff's LTD benefits were revoked and asserting the view that Plaintiff's gastrointestinal problems and substantial daily narcotics use effectively make it impossible for any company to keep him on as an employee).

        4.     Defendant's Determination that Plaintiff Could Hold Other Jobs Was Inadequately Reasoned and Explained

As one might expect, the assessment of whether Plaintiff is entitled to LTD benefits (or more precisely, in this case, was entitled to maintain the receipt of LTD benefits that he had already been receiving for some three years) involves not only an assessment of whether Plaintiff could hold his former job, but also any other reasonably available job. As explained below, Defendant's determination that Plaintiff could hold other jobs was inadequately reasoned and supported, and this deficiency, too, independently would justify reversal of Defendant's decision to terminate Plaintiff's LTD benefits.

In this Court, Defendant makes no serious attempt to justify the assertion in the record of

Ms. Rebecca Katz—who appears to be a disability claims manager for Defendant—that Plaintiff could perform the occupations of stationary security guard, customer support representative, or automobile materials dock supervisor. (A.R. 155.) Plaintiff asserts, and Defendant does not challenge, that there is no evidence that Ms. Katz has any training to assess whether Plaintiff could obtain and maintain these jobs. *See* D.E. 21 at 20 (Defendant's concession that "[t]he administrative record is admittedly silent as to Ms. Katz's qualifications" to offer any opinion as a vocational analyst). Given Defendant's concession and the utter lack of reasoning reflected in Ms. Katz's report as to why one could reasonably conclude that Plaintiff could obtain and maintain such jobs, the Court cannot conclude that Ms. Katz's assertions represent reasoned decisionmaking.

Defendant nonetheless asserts that "Plaintiff completely ignores the evidence from the vocational expert contained in the [ALJ's] Social Security decision." (*Id.*) (As explained below, Defendant's reference is to an ALJ's decision that Plaintiff was not disabled to such a degree that he was entitled to SSA disability benefits—a decision that was subsequently reversed and remanded by Judge Crabb in the Western District of Wisconsin.) According to Defendant, "even assuming Ms. Katz was not qualified to render a vocational opinion, there was nonetheless evidence from a vocational expert that found that Plaintiff could perform sedentary occupations based on his education, training and experience." (*Id.*) Putting aside for a moment the question of whether one can defend a benefits denial on the basis of an ALJ decision that itself was later found to be inadequately reasoned and supported, Defendant's argument is nonetheless flawed.

Precedent teaches that in order for a claimant to ERISA benefits to receive a "'full and fair review' of a denial of benefits, 29 U.S.C. § 1133, and, in order to permit such a review, the

notice of decision [denying a benefits claim] must include specific reasons." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693 (7th Cir. 1992) (citations to ERISA regulations omitted). As *Halpin* explained, "[t]his requirement ensures that a full and fair review is conducted by the administrator, enables the claimant to prepare adequately for appeal to the federal courts or further administrative review, and makes it possible for the courts to perform the task, entrusted to them by ERISA, of reviewing that denial." *Id.*, 962 F.2d at 693 (citation omitted). In this case, while the record reflected that Defendant was aware of the denial of Plaintiff's SSA benefits application (in that Defendant informed Plaintiff that even if the ALJ's decision were reversed, Defendant did not intend to maintain payment of LTD benefits (A.R. 100)), nothing in Defendant's denial letter to Plaintiff even suggested that the Defendant's decision rested on any vocational assessment or conclusion of the ALJ in the SSA proceedings. *See, e.g.*, A.R. 107-08 (April 30, 2003 denial correspondence); A.R. 154-56 (similar); *accord* A.R. 98-100 (appeal denial letter). As a result, Defendant cannot seek to patch over its faulty analysis in the first instance (*i.e.*, the Katz assertions) by reference to the ALJ's assessment now.[9]

---

[9] Defendant overreads certain statements in at least certain respective physician's reports which asserted that Plaintiff would be capable of sedentary work. For example, Dr. James Slattery, an orthopedic surgeon, wrote in November 1999 that Plaintiff "is capable of sedentary work only." (A.R. 246.) Similarly, James Sehloff, who specializes in pulmonary medicine, wrote in November 1999 that Plaintiff "needs stationary work." (A.R. 276.) Aside from the fact that these reports were not particularly probative of Plaintiff's situation in 2003 when Defendant elected to terminate payment of his LTD benefits, it is clear that both of these reports were based on the respective doctor's assessment of the impact of limitations created by medical issues related to the doctor's respective speciality. As precedent instructs, the relevant analysis entails a look at whether a claimant is disabled as a result of all of his medical impairments. *See also* A.R. 152 (May 2003 letter from Dr. Johnson asserting that Plaintiff was disabled and could not hold a job because of gastrointestinal problems and the effects of taking substantial, daily doses of narcotic pain medication); A.R. 122, 124 (analysis of Defendant's medical reviewer glossing over gastrointestinal issues and conducting inadequate analysis of impact of prescription narcotic use because reviewer relied on reports concerning impact of lower doses of drugs years earlier).

Because of this fundamental, threshold deficiency with the vocational assessment, Defendant's heated assertions that Plaintiff has engaged in illicit behavior by explaining that the ALJ decision was subsequently reversed and remanded because of various inadequacies in its analysis (including the vocational assessment) are not of material consequence. Nonetheless, in the interests of completeness, and because Defendant went so far as to file a motion to strike references to the subsequent reversal of the ALJ decision, a brief response is in order.

To be sure, it is a truism that arbitrary and capricious review entails a review of the materials that were available to a plan administrator at the time a benefits determination was made. *See, e.g., Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 982 (7th Cir. 2000) (collecting cases). Nonetheless, precedent teaches that while ERISA does not require an administrator to conduct a "'full-blown' investigation . . . it does demand a 'reasonable inquiry' into a claimant's medical condition and his vocational skills and potential." *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 961 (7th Cir. 2001) (citation omitted). Defendant cites no authority to suggest that an administrator's reliance (assuming it had actually occurred and been properly documented) on a facially defective ALJ assessment about job potential would discharge Defendant's burden of conducting a reasonable inquiry. Judge Crabb's subsequent decision reversing the ALJ's deficient decision confirms that the ALJ decision was in fact facially deficient, but Judge Crabb's ruling simply confirmed what otherwise would have been apparent to Defendant had it engaged in a serious assessment and documentation of Plaintiff's job potential. Moreover, the Court finds it difficult to understand how Plaintiff can be faulted (almost at the level of acting in an untoward manner) by pointing out that the ALJ's legal decision was later reversed, a matter of public record that does not appear to

be meaningfully analogous to a misstep such as suggesting that additional discovery might be warranted in an abuse of discretion case, or suggesting that previously unprovided medical reports suggest a different result.

Defendant's motion to strike Plaintiff's references to the fact that the ALJ decision was subsequently reversed and remanded is denied. The motion is of no practical consequence, as Defendant did not assert that it was relying on any SSA determination or analysis in its denial notifications to Plaintiff, such that Plaintiff could administratively challenge such purported reliance and analysis. Furthermore, irrespective of whether one is cognizant of Judge Crabb's subsequent reversal, the deficiencies in the ALJ opinion are present, and would have been apparent to Defendant, if Defendant had engaged in a meaningful review of the issue of whether Plaintiff could maintain other employment. (As addressed below, perhaps one could reasonably conclude that Plaintiff could maintain some job, but Defendant certainly made no meaningful, documented analysis of the issue before it terminated Plaintiff's LTD benefits.) Because the motion to strike is of no practical consequence, and because Defendant cites no authority to suggest that Plaintiff's notation that the deficiencies apparent in the ALJ decision were confirmed in a publicly available legal decision by Judge Crabb is somehow illicit, Defendant's motion to strike is denied.[10]

---

[10] Even if Defendant's motion to strike were granted, it would not alter the result in this case at all. Defendant did not document any reliance on the ALJ decision in its denial letters, as was required. Moreover, even if it were illicit to know that Judge Crabb's decision subsequently reversed the ALJ opinion, Defendant cannot create reasoned decisionmaking for the ALJ opinion that is not reflected in it, and accordingly cannot show that Defendant itself engaged in any reasonable assessment of Plaintiff's LTD benefit status.

5.    Reasoned Decisionmaking Requires More Effort and Documentation Than Just Skepticism

As explained above, the Defendant's decision to terminate Plaintiff's receipt of LTD benefits suffered from serious procedural and substantive flaws. The Court nonetheless notes that it is clear from a review of the record that Defendant does not believe that Plaintiff is nearly as incapacitated as he claims, at least from his diarrhea problems. In this regard, Defendant noted, for example, that despite Plaintiff's claims of a chronic, incapacitating diarrhea condition, Plaintiff has never experienced weight loss nor needed to be hospitalized or treated for dehydration. (A.R. 154.) Defendant also noted that Dr. Johnson had not personally witnessed Plaintiff's claimed incapacitating diarrhea problems, but instead largely relied on Plaintiff's reports of his problems in this regard. Nonetheless, as explained elsewhere, there is meaningful evidence in the record from a third-party (i.e., Mr. Baun, Plaintiff's former supervisor) attesting to Plaintiff's incapacitating bouts of diarrhea—*see* A.R. 105.[11] Defendant is not required, of course, to credit all testimony and diagnoses offered by a claimant, but Defendant switched course and reversed its own prior LTD benefits award without even having a medical doctor review the file. And after Defendant referred the matter to its medical analyst, that doctor never

_____

[11] Although not part of the record for arbitrary and capricious review, because it was submitted in frustration after Plaintiff's LTD benefits were finally terminated, Mr. Baun wrote a letter to Defendant in August 2003, in which he underscored that "I can tell you first hand as an employer, that I have witnessed Kurt [Nickola] having to excuse himself more than once while working on the sales floor with a customer, and heading immediately to the restroom. And no, I did not follow Kurt into the restroom to witness his actions, but I can tell you that this was not your normal need to relieve oneself. Again, I am not a doctor, but an employer, and isn't this about Kurt's ability to obtain, complete and hold a job?" A.R. 102; *see also id.* ("I will ask you to reconsider your recent determination once more, before I sever our ties with CNA. This is not right. The reality is, that this man is incapable of holding any full time job. I would be happy to discuss my experiences as his employer with you at any time.")

undertook any meaningful analysis of how Plaintiff's claimed diarrhea problems would impact his ability to maintain other employment. Instead, Defendant's doctor simply speculated that "[r]egarding the gastrointestinal symptoms, this would be a matter of degree, but if restroom facilities were close at hand, this would also not preclude each and every occupation." (A.R. 124.) It is difficult to disagree with the doctor's tautology—most things in life are a question of degree—but that is not a reasoned rejection of the evidence from Plaintiff's former supervisor, and the conclusions of Plaintiff's physician, Dr. Johnson, that Plaintiff's diarrhea problems were so acute and so recurrent that he was effectively incapable of holding a job. Defendant is not precluded in law from being skeptical (indeed, it has a responsibility to its shareholders to have a reasonable degree of skepticism), but skepticism alone is not enough to constitute reasoned decisionmaking sufficient to pass arbitrary and capricious review. *See generally Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (holding that plan administrators are not required to accord special weight to the views of a claimant's treating physician, but also teaching that administrators "of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician" and also requiring administrators to adduce "reliable evidence that conflicts with a treating physician's evaluation"); *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 961 (7th Cir. 2001) (explaining that ERISA requires a "reasonable inquiry" into, among other things, a claimant's medical condition). The Court notes that if Plaintiff's diarrhea and vomiting problems are nearly as bad as he, his doctor, and his former supervisor claim,[12] even a modest level of medical analysis and review will

---

[12] *See, e.g.*, A.R. 119 (reference to Plaintiff's account of having diarrhea and vomiting that are "completely unpredictable" but "occur on at least an every-other-day basis"); A.R. 105 (Baun letter to CNA in conjunction with benefits appeals review process, in which Baun attests

confirm his claims. And, conversely, if medical review and observation fails to substantiate

Plaintiff's accounts, then Defendant might have a legitimate basis to reject Plaintiff's claims

about the diarrhea debilitation and perhaps to question whether Plaintiff actually is entitled to

LTD benefits prospectively. But the inquiry never was completed. So, Defendant's skepticism,

cursory analysis, and *ipse dixit* are not enough to justify reversal of its prior decision to award

LTD benefits to Plaintiff. Reasoned decisionmaking demands more to avoid the conclusion that

Defendant acted arbitrarily and capriciously.

      6.     Appropriate Remedy

Given the missteps described above, the Court must consider the proper disposition of the

case and the pending motions. Precedent teaches that where, as here, the plaintiff was otherwise

entitled to continuing long-term disability benefits, and there has been an arbitrary and capricious

termination of those benefits by the defendant, the proper course is to order damages in the

amount of benefits that would otherwise have paid. *See, e.g., Hackett v. Xerox Corp. Long-Term

Disability Income Plan*, 315 F.3d 771, 776-77 (7th Cir. 2003) (collecting cases); *Halpin*, 962

F.2d at 697 (collecting cases). As was explained in *Hackett*, this Court's decision does not

preclude, nor does it speculate about the proper or permissible outcome of, any future attempt by

Defendant to terminate Plaintiff's long-term disability benefits if Defendant believes that is

warranted. *See Hackett*, 315 F.3d at 777; *accord Halpin*, 962 F.2d at 697. Nonetheless, in the

absence of a properly conducted review, and a properly supported decision, the *status quo ante*

---

to having seen Nickola's "sudden and unpredictable needs of bathroom facilities, often
interrupting in the middle of a sentence or discussions. These interruptions can last for five, ten
or several minutes longer. And these are on good days. There are many times when he is
virtually bed ridden or confined to a chair or even the bathroom for hours at a time.").

applies, and in this case that warrants payment of long-term disability benefits to Plaintiff. *See* A.R. 190 (letter from Defendant to Plaintiff explaining that Plaintiff was entitled to long-term disability benefits until age 65 (*i.e.*, through December 26, 2018), at least absent further action).

Plaintiff is also entitled to prejudgment interest. The "'presumption in favor of prejudgment interest awards [for violations of federal law] is specifically applicable to ERISA cases.'" *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002) (quoting *Rivera v. Benefit Trust Life Ins. Co.*, 921 F.2d 692, 696 (7th Cir. 1991)). Defendant offers no reason in law or equity as to why the presumption in favor of prejudgment interest should not control here, and an award of prejudgment interest simply serves to make Plaintiff whole. *Accord Fritcher*, 301 F.2d 820. The parties have not addressed the proper rate of prejudgment interest, so the Court is left without their views on that subject. Although assessment of this rate is a discretionary call, precedent teaches that the prime rate in a sensible benchmark, along with some modest premium to account for the risk of default. *See id.* (discussing and applying *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436-37 (7th Cir. 1989)). The risk of default here seems modest, at best, so the Court will order prejudgment interest at the prime rate in effect as of the approximate date of this opinion (6.25%), plus a .35% (*i.e.*, thirty-five basis point) premium for risk of default, or a 6.6% total rate of ordinary interest. This premium will also incorporate the potential for calculating compounding interest, which will not be awarded. *Accord Fritcher*, 301 F.3d at 820.

7.    Plaintiff Is Entitled to Reasonable Attorney's Fees

The Court also must exercise its discretion to determine whether an award of attorney's fees and taxable costs is appropriate. *See id.* at 818-19 (collecting cases); *accord, e.g., Little v.*

*Cox's Supermarkets*, 71 F.3d 637, 644 (7th Cir. 1995) (holding that "a district court's determination will not be disturbed if it has a basis in reason"). As the Seventh Circuit has noted, it has offered two metrics to determine whether an attorney's fees award is appropriate in ERISA cases. *See Fritcher*, 301 F.3d at 819; *Prod. and Maint. Employees' Local 504 v. Roadmaster Corp.*, 954 F.2d 1397, 1404-05 (7th Cir. 1992). The first, and most commonly used, test involves an assessment of five factors:

> (1) the degree of the offending party's culpability or bad faith; (2) the degree of the offending party's ability to satisfy an award of attorney's fees; (3) the degree to which such an award would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on all the plan members; and (5) the relative merits of the parties' positions.

*Fritcher*, 301 F.3d at 819 (internal quotation marks and citation omitted). There is a second test, which borrows factors typically used for fee assessments under the Equal Access to Justice Act, but the ultimate substance of the two tests is materially identical. *See, e.g., Prod. and Maint. Employees' Local 504*, 954 F.2d at 1405 ("[W]e [have] decided that the difference between the two tests was insubstantial.") (citing *Meredith v. Navistar Int'l Trans. Corp.*, 935 F.2d 124, 128 (7th Cir. 1991)). "The 'bottom-line question' under either approach 'is essentially the same: was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?'" *Prod. and Maint. Employees' Local 504*, 954 F.2d at 1405 (quoting *Meredith*, 935 F.2d at 128). Importantly, because of the difficulty of making such a showing, a party need not "actually show subjective bad faith to justify a fee award." *Prod. and Maint. Employees' Local 504*, 954 F.2d at 1405 (citing *Bittner v. Sadoff & Rudoy Indus.*, 728 F.2d 820, 830 (7th Cir. 1984)). In fact, precedent teaches that there is a "modest presumption . . . in favor of awarding reasonable attorney's fees to the winning party . . . unless the loser's position, while

29

rejected by the court, has a solid basis." *Prod. and Maint. Employees' Local 504*, 954 F.2d at 1405 (internal quotation marks and citation omitted).

In this case, the Court finds that an award of reasonable attorney's fees and taxable costs is appropriate. Reviewing the typically employed five-factor test, the Court finds that the Defendant has substantial culpability in terms of its deficient treatment of Plaintiff's LTD claim and benefits stream. As explained at length above, Defendant's analysis of the propriety of terminating Plaintiff's LTD benefits was deficient in a number of significant and often independent respects. Relatedly, the fifth factor, the relative merits of the parties' positions, also militates in favor of an award. There also is no dispute that the second factor—*i.e.*, Defendant's ability to pay—also cuts in favor of an award. The third factor—the degree to which such an award would deter other persons acting under similar circumstances—also cuts in favor of an grant of fees and costs. To be sure, the fourth factor—the amount of benefit conferred on all the plan members—is functionally non-existent. (This was not a suit designed to confer benefits generally to all plan participants, and if a plaintiff's simply prevailing were sufficient to satisfy the fourth factor, then this factor would be close to meaningless in terms of trying to make a discretionary assessment.) Nonetheless, the absence of this single factor does not change the bottom-line analysis, particularly given the modest presumption in favor of an award of fees applicable here. Accordingly, based on an overall review of the five factors, the Court finds that an award of fees and taxable costs is justified.

The amount of the attorney's fee award cannot be determined based on the filings presented. The parties are directed to confer and see if they can determine a mutually agreed number (with Defendant reserving all rights to dispute the propriety of the Court's rejection of its

disability assessment, of course, should it choose to do so). In this regard, it is worth noting that the analysis will substantially hinge on the familiar lodestar method of analysis. *See Fritcher*, 301 F.3d at 819 (collecting cases).

## IV.  CONCLUSION

For the foregoing reasons, the Court grants the summary judgment motion of the Plaintiff (D.E. 12). Plaintiff is entitled to an award of monies that should have been paid but for the defective termination of Plaintiff's long-term disability benefits, plus prejudgment interest as specified above (*i.e.*, prime plus .35%). The Court also awards attorneys' fees and taxable costs, in an amount to be determined. The Court denies the summary judgment motion of the Defendant (D.E. 21). Defendant's motion to strike (D.E. 29) is effectively moot, for the reasons stated above, and denied on that basis and on the merits for the reasons stated above as well. So Ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated:  8/5/05